## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 17 2019, 8:47 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Cara Schaefer Wieneke
Wieneke Law Office, LLC
Brooklyn, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Natalie F. Weiss
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship, O.W., Minor Child,

E.S., Mother,

*Appellant-Respondent*,

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

December 17, 2019

Court of Appeals Case No.
19A-JT-1911

Appeal from the Knox Superior Court

The Honorable Gara U. Lee, Judge

Trial Court Cause No.
42D01-1811-JT-31

**Brown, Judge.**

[1]  E.S. ("Mother") appeals the involuntary termination of her parental rights to her child, O.W.  We affirm.

## Facts and Procedural History

[2]  Mother has three sons, O.W., who was born on June 23, 2009, S.W., who was born on February 8, 2007, and N.W.[1]  On January 27, 2016, the father of S.W. and O.W. died.

[3]  In August 2016, the Indiana Department of Child Services ("DCS") received a report alleging S.W. was the victim of neglect and a separate report alleging O.W. was the victim of physical abuse by Mother when she hit him with a hanger resulting in an injury to O.W.'s lip, tongue, and tooth.  On August 31, 2016, DCS filed a request for authorization to file a petition alleging O.W. was a child in need of services ("CHINS").

[4]  On August 31, 2016, the court entered an order authorizing DCS to take O.W. into immediate protective custody and to file a petition.  That same day, DCS filed a verified petition alleging O.W. to be a CHINS which mentioned the physical abuse and that the home was covered in trash and food, the home had animal feces and roaches, the walls had holes, multiple knives were lying within reach of the children, and there was a lack of food.

---

[1] Family Case Manager Vanessa Luchtefeld testified that there were originally three children involved and that the eldest child, N.W., was adjudicated a child in need of services and "aged out."  Transcript Volume II at 63.

[5] On December 9, 2016, the court entered an order finding Mother had signed a stipulation to an adjudication of CHINS and adjudicated O.W. a CHINS. On January 6, 2017, the court entered a dispositional order which ordered Mother to: contact the family case manager every week; notify the family case manager of any changes in address, household composition, employment, or telephone number within five days; allow the family case manager or other service providers to make announced or unannounced visits to her home; enroll in programs recommended by the family case manager or other service provider; maintain all appointments with any service provider; maintain suitable, safe, and stable housing; secure and maintain a legal and stable source of income; refrain from using any illegal controlled substances or alcohol; obey the law; complete a parenting assessment; submit to random drug screens; attend all scheduled visitations with O.W.; and comply with all visitation rules. On November 27, 2018, DCS filed a verified petition for involuntary termination of the parent-child relationship between O.W. and Mother.

[6] On April 17 and 25, 2019, the court held a factfinding hearing. The court indicated it was holding a consolidated hearing for cause number 42D02-1811-JT-31, related to O.W., and cause number 42D01-1811-JT-30 ("Cause No. 30"), related to the termination of Mother's parental rights to S.W. Mother testified that she had pending charges of battery and two counts of theft. She testified that she had been homeless, another family took her in "for a little bit," and that she had been "pretty much couch surfing." Transcript Volume II at

34. When asked if she did not have stable housing for the children at the time, she answered, "Yeah, obviously." *Id.* at 48.

[7] When asked about her work history, she stated that she worked at Progress, Comfort Suites, Farbest, McAllister's Deli, McDonalds, and Perdue, that she quit her job at Farbest, and that she was currently employed at Vuteg Toyota. When asked how long she stayed at each of those jobs, she answered "a couple months, two, three months . . . [a]t least three months." *Id.* at 36. Mother admitted to using illegal substances including methamphetamine and marijuana since January 2017, to testing positive for methamphetamine on March 15, 2019, and to failing to routinely submit to random drug screens.

[8] Family Case Manager Vanessa Luchtefeld ("FCM Luchtefeld") testified that she received the case in May 2018, detailed the services she provided to Mother, and indicated that Mother had not met any of the goals for reunification. She indicated that Mother periodically submitted to random drug screens and tested positive for methamphetamine and THC. She testified that S.W. has serious behavioral issues, attempted to commit suicide, was placed in Gibault, and received therapeutic services. She stated that O.W. sees a therapist for behavior issues once every three months and was on medication. She indicated that she did not believe that there is a probability that Mother has remedied the situation that led to the children's removal.
When asked why not, she answered: "Due to the history of her relapsing numerous times. Not being able to obtain or maintain housing, employment, and the continuance of the criminal history that keeps occurring." *Id.* at 69.

She stated that O.W. was in a relative placement and they were willing to adopt him, and that S.W. was adoptable and DCS has services and programs that will assist helping S.W. find a permanent home. She indicated that termination of Mother's parental rights was in the children's best interests and that returning the children to Mother will be a threat to their well-being.

[9]     Upon cross-examination by Mother's counsel, FCM Luchtefeld indicated that S.W. had been at Gibault since December 2018 and had been in approximately seven or eight different homes or placements since his removal, and that O.W. was residing with his maternal uncle. She testified that N.W. had no communication with S.W. or O.W. since he turned eighteen years old. On redirect examination, she stated that the relationship between S.W. and O.W. was "pretty rocky" when she received the case but had improved. *Id.* at 78. She indicated that S.W. and O.W. could potentially write, call, or see each other again. Upon questioning by the court, she stated that placement of S.W. with the maternal uncle was a possibility, that the uncle had "been on the fence about it," and that he wanted to ensure that S.W. was able to maintain his behaviors and utilize coping techniques. *Id.* at 81.

[10]    Family Case Manager Tiffany Shepherd testified that S.W. was initially placed with his maternal uncle but was removed after he hit his uncle's pregnant girlfriend in the stomach. She indicated that S.W. had other placements and was eventually placed in Mother's care until she had a positive drug screen in August 2017 for methamphetamine and marijuana. She stated that S.W. had

been diagnosed with ADHD, anxiety, and depression, and that O.W. had been diagnosed with ADHD.

[11] Emma Marsh, a visit supervisor and parent aide at Rain Tree Consulting, testified that she took over the case in December 2018 when Mother was homeless, that Mother was not compliant with visits, and that Mother had four jobs during the four months she worked with her and had not been employed the entire time.

[12] Court Appointed Special Advocate Cheryl Hugunin testified that she had concerns regarding reunifying the children with Mother because she did not have stable housing or stable employment, she had positive drug screens, and the mental health issues of Mother and the children needed to be addressed. She testified that she believed that "it was an abusive relationship to begin with, and I don't think that that has been resolved." *Id.* at 133.

[13] On July 19, 2019, the court terminated Mother's parental rights to O.W.[2] The court found that O.W. was removed from Mother's care due to her mental instability, instances of physical abuse, and deplorable home conditions. It found that Mother had a pending charge of battery resulting in bodily injury to a person under fourteen years old as a level 5 felony and violated her pretrial release on three separate occasions for positive drug screens as well as being arrested for additional charges. It found that Mother continued to engage in

---

[2] The court also terminated Mother's parental rights to S.W. in a separate order under Cause No. 30.

acts that resulted in criminal charges throughout the underlying case including two pending charges of theft as level 6 felonies. The court detailed her residential instability, employment instability, and drug use. It found that O.W. had been removed from Mother's care for more than six months, there was a reasonable probability that the conditions which resulted in O.W.'s removal and continued placement outside the home would not be remedied, continuation of the parent-child relationship posed a threat to O.W.'s well-being, termination of parental rights was in O.W.'s best interests, and there was a satisfactory plan for the care and treatment of the child.

## *Discussion*

[14] The issue is whether the evidence is sufficient to support the termination of Mother's parental rights. In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and

> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[15] The State's burden of proof for establishing the allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2), *reh'g denied*. This is "a 'heightened burden of proof' reflecting termination's 'serious social consequences.'" *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014) (quoting *In re G.Y.*, 904 N.E.2d at 1260-1261, 1260 n.1). "But weighing the evidence under that heightened standard is the trial court's prerogative—in contrast to our well-settled, highly deferential standard of review." *Id*. We do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence. *Id*. We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment. *Id*.

[16] Reviewing whether the evidence clearly and convincingly supports the findings, or the findings clearly and convincingly support the judgment, is not a license to reweigh the evidence. *Id*. "[W]e do not independently determine whether that heightened standard is met, as we would under the 'constitutional harmless error standard,' which requires the reviewing court itself to 'be sufficiently

confident to declare the error harmless beyond a reasonable doubt.'" *Id.* (quoting *Harden v. State*, 576 N.E.2d 590, 593 (Ind. 1991) (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824 (1967))). "Our review must 'give "due regard" to the trial court's opportunity to judge the credibility of the witnesses firsthand,' and 'not set aside [its] findings or judgment unless clearly erroneous.'" *Id.* (quoting *K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cty. Office*, 989 N.E.2d 1225, 1229 (Ind. 2013) (citing Ind. Trial Rule 52(A))). "Because a case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence." *Id.* at 640. The involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B).

[17] Mother expressly states that she does not dispute that DCS proved that there was a reasonable probability the conditions that resulted in the removal or the reasons for the child being placed outside her home will not be remedied, that continuation of the relationship posed a threat to the O.W.'s well-being, or that there was a satisfactory plan for the child's care and treatment. Rather, Mother asserts that DCS failed to carry its burden with respect to whether termination was in O.W.'s best interest. She contends that stability and permanency should not be the only considerations, particularly when O.W. has a sibling. Without citation to the record, she asserts that she was doing well at the time of the termination hearing and allowing her additional time to work toward

reunification would have provided the brothers an opportunity for their sibling relationship to remain intact.

[18] In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the court must subordinate the interests of the parent to those of the children. *Id.* Children have a paramount need for permanency which the Indiana Supreme Court has called a central consideration in determining the child's best interests, and the Court has stated that children cannot wait indefinitely for their parents to work toward preservation or reunification and courts need not wait until the child is irreversibly harmed such that the child's physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *In re E.M.*, 4 N.E.3d 636, 647-648 (Ind. 2014). However, focusing on permanency, standing alone, would impermissibly invert the best-interests inquiry. *Id.* at 648.

[19] To the extent Mother does not challenge the court's findings of fact, the unchallenged facts stand as proven. *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to challenge findings by the trial court resulted in waiver of the argument that the findings were clearly erroneous), *trans. denied*. While Mother appears to focus on O.W.'s sibling relationship with S.W., we note that Mother's parental rights with respect to S.W. have been terminated. Further, when asked separately if she thought it was in the best interest of the children for Mother's parental rights to be terminated and if the best likelihood for the

children to have a permanent plan for their life would be to be adopted, FCM Luchtefeld responded affirmatively. Based on the testimony, as well as the totality of the evidence in the record and set forth in the trial court's termination order, we conclude that the court's determination that termination is in O.W.'s best interests is supported by clear and convincing evidence.

[20] Affirmed.

Baker, J., and Riley, J., concur.